## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Tyrone White,

      Petitioner,

v.

Lynn Dingle,

      Respondent.

**Case No.:  06-CV-1343 (PJS/SER)**

**REPORT AND RECOMMENDATION**

      Jennifer M. Macaulay, Esq., Macaulay Law Offices, Ltd., 649 Grand Avenue, Suite 2, Saint Paul, MN 55105, for Petitioner.

      Jennifer R. Coates, Esq., Minnesota Attorney General's Office, 445 Minnesota Street Suite 1800, Saint Paul, MN 55101, for Respondent.

STEVEN E. RAU, United States Magistrate Judge

      The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.  In 2003, a Saint Louis County jury convicted Petitioner Tyrone White ("White") of first-degree premeditated murder, first-degree felony murder, Minn. Stat. § 609.185(a)(3), and attempted first-degree premeditated murder, Minn. Stat. § 609.185(a)(1).  *State v. White* (*White I*), 684 N.W.2d 500, 502 (Minn. 2004).  The Honorable Mark A. Munger ("Judge Munger")  sentenced White to life imprisonment and 180 months of confinement served consecutively.  *Id*. at 502.  The Minnesota Supreme Court's affirmance of White's conviction specifically recites the facts of White's crimes.  *Id*. at 500.  The Minnesota Supreme Court also denied White's petition for post-conviction relief.  *White v. State* (*White II*), 711 N.W.2d 106, 110-11 (Minn. 2006).

      White, currently a state inmate at the Minnesota Correctional Facility at Stillwater, filed an Amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State

Custody on October 11, 2010 ("Am. Pet."); [Doc. No. 61].   The Eighth Circuit has heard this case twice and its extensive procedural history prior to the Eighth Circuit's second remand will not be repeated.   *White v. Dingle* (*White III*), 267 Fed. App'x 489 (8th Cir. 2008); *White v. Dingle* (*White IV*), 616 F.3d 844 (8th Cir. 2010).   The case was remanded "with instructions for the court to allow White to amend his petition and proceed with his exhausted claims."   *White IV*, 616 F.3d at 849.

On May 29, 2012, the Court ordered Respondent Lynn Dingle ("Dingle") to "supplement the administrative record with all pretrial discovery disclosures, witness lists, and trial exhibits" within 30 days.   (Order Dated May 29, 2012) [Doc. No. 84].   After requesting and receiving a short extension, Dingle submitted these materials on July 9, 2012.   (Aff. of Jennifer Coates, "Coates Aff.") [Doc. No. 91].

White's Amended Petition alleges five grounds for relief: (1) the trial court erred by allowing the state to preemptively strike a Native American juror; (2) Minnesota's accomplice liability statute unconstitutionally eliminated the state's burden to prove White possessed the requisite mental state; (3) the grand jury selection process was racially discriminatory and violated the Equal Protection Clause; (4) White did not intelligently waive his constitutional rights; and (5) his trial and appellate counsel were ineffective.   (Am. Pet. at 6-16).   In response to White's Amended Petition, Dingle argued that the state court determinations on the following issues were not unreasonable or contrary to United States Supreme Court precedent: (1) preemptive strike of a Native American juror (Ground One); (2) the state met its burden to prove the requisite mental state under the accomplice liability statute (Ground Two); and (3) resolution of several of White's ineffective assistance claims (Ground Five).   (Resp't's Mem. of L. in Supp. of Answer) ("Resp't's Mem.") [Doc. No. 70 at 9-21, 24-34].   Dingle further asserted that

2

White's Equal Protection Clause grand jury racial composition claim (Ground Three) is procedurally defaulted and that White's lack of intelligent waiver claim (Ground Four) does not constitute an independent basis for habeas relief.   (*Id.* at 21-24).   For the reasons discussed below, the Court recommends that the Amended Petition be denied and the action be dismissed.

## I.   DISCUSSION

### A.  Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of 28 U.S.C.) ("AEDPA") prescribes the standards that govern this Court's substantive review of White's Habeas Petition.  The relevant portion of AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 405-11 (2000), the United States Supreme Court discussed how federal district courts should apply the AEDPA.   State court decisions are "contrary to" Supreme Court precedent under § 2254(d) when the state court:  (1) reaches a conclusion opposite to the Supreme Court on a question of law; or (2) arrives at a result opposite to Supreme Court precedent involving "materially indistinguishable" facts.  *Id.* at 405.   The "unreasonable application" clause of § 2254(d)(1) provides that even if the state court correctly

identifies the relevant Supreme Court principle, a federal court may grant a prisoner's writ if the state court applied the principle unreasonably to the facts of the case.  *Id.* at 413.  The standard for determining whether a state court's decision is an "unreasonable application," is "whether the state court's application of clearly established federal law was **objectively unreasonable**. . . ." *Id.* at 409 (emphasis added).   A writ may not be issued simply because the federal court concludes the state court's application of federal law was erroneous or incorrect, but only where the state court's decision was also unreasonable.  *Id.* at 411.

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Habeas relief can, therefore, be granted if the conviction is based on findings of fact that could not be derived reasonably from the state court evidentiary record.   When reviewing a state court decision, however, "a federal court . . . presumes that the state court's factual determinations are correct," and such a presumption "may be rebutted only by clear and convincing evidence."  *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000).

Generally, a federal district court is not allowed to conduct its own *de novo* review of a prisoner's constitutional claims.   Habeas relief cannot be granted unless the prisoner has identified, and substantiated, a specific error committed by the state courts.   Moreover, he must show that the state courts committed the type of error that is actionable under § 2254(d), as that statute has been interpreted in *Williams*.

**B.  Analysis**

**1.  Preemptory Challenge of Native American Juror (Ground One)**

White asserts that in ruling on his objection to the state's peremptory challenge of a

Native American juror, the Minnesota Supreme Court's application of *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) was objectively unreasonable.  (Pet.'s Mem. in Supp. of Pet. for Relief Under 28 U.S.C. § 2254, "Pet.'s Mem.") [Doc. No. 76 at 6-12].  Reviewing the trial court's decision for clear error, the Minnesota Supreme Court affirmed the trial court's determination that the *prima facie* showing of discrimination, which is the first element of a *Batson* challenge, was not satisfied.  *White I*, 684 N.W.2d at 508.  It also determined that the trial court did not apply an incorrect standard after determining that no "pattern" of discrimination existed.  *Id.*; (Admin R. at 1067-68).  The Court agrees with Dingle that the Minnesota Supreme Court did not unreasonably apply United States Supreme Court precedent in affirming the trial court's denial of White's *Batson* challenge.  (Resp't's Mem. at 9-16).

### a.  Relevant Facts

Dawn Paro-Strother ("Paro-Strother"), a Native American juror, asserted in her juror questionnaire and in *voir dire* that she knew one of the potential witnesses, Louise McKnight ("McKnight"), her husband's aunt.  (Admin. R. at 1030-31, 1063-64, 1072-73).  Paro-Strother surmised that in the past White likely did some work for McKnight.  (*Id.* at 1031, 1034).  Additionally, the Saint Louis County Attorney's Office prosecuted Paro-Strother's daughter for felony drug possession.  (*Id.* at 1040).  She asserted that in her daughter's case, she had no conversations with the Saint Louis County Attorney's Office, where the prosecutor in the instant case, John E. DeSanto ("Mr. DeSanto"), worked.  (*Id.* at 1058).  Judge Munger sentenced Paro-Strother's daughter.  (*Id.* at 1058-59).

In response to a question from Mr. Ira Whitlock ("Mr. Whitlock"), White's counsel, about her husband's job at a juvenile detention facility, Paro-Strother stated that she and her husband thought that "things could be better" for racial minorities and that there were too many

minority children in the criminal justice system.  (*Id.* at 1044-45).  She did not, however, believe that minorities were more likely to commit crimes and she asserted societal problems explain high minority crime rates.  (*Id.* at 1045-46, 1060-61).  Mr. Whitlock asked Paro-Strother his remaining questions, accepted her for the jury, and passed her for cause.  (*Id.* at 1057).

After questioning Paro-Strother, Mr. DeSanto exercised a preemptory challenge.  (*Id.* at 1065).  Immediately, Mr. Whitlock made a *Batson* challenge asserting that white jurors with connections to minorities had been removed for cause and that Mr. DeSanto's actions purportedly demonstrated "a pattern . . . [where] anyone who has any connection with African American people appears to be stricken from this jury."  (*Id.* at 1067-68).  He expressed his concern that White receive a fair trial because he had observed a great deal of racial discrimination in greater Minnesota.  (*Id.* at 1069-70).   Although, in Saint Louis County, Mr. Whitlock believed that "most people have been overly fair to me, [and] go out of their way to assist me in any way they can."  (*Id.*).  Mr. Whitlock "decided strategically" not challenge the racial composition of the trial jury pool, citing the presence of several Native Americans and one African American.  (*Id.* at 1068).  He moved the Court to require the state to meet its burden to rebut the *Batson* challenge pursuant to Minn. R. Crim. P. 26.02, subd. 6a(3)(a).  (*Id.* at 1070).

Judge Munger determined that no *prima facie* showing had been made that race factored into Mr. DeSanto's preemptory challenge of Paro-Strother.  (*Id.*).  Mr. DeSanto read Minn. R. Crim. P. 26.02, subd. 6a(3)(a) into the record and emphasized that Mr. Whitlock removed prospective juror Richard Harms ("Harms")[1] for cause, despite his connection to a minority, because his step-daughter may have known victim Tami Carlson ("Carlson").  (*Id.* at 1071-72).

---

[1]      Harms's wife's daughter had been a roommate of victim Carlson.  (*Id.* at 830, 842).  Harms did not ever meet Carlson and did not go into the house.  (*Id.* at 843-44).  Nor did he have contact with his wife's daughter at the time she was living with Carlson.  (*Id.* at 842-44).  Mr. Whitlock's request to remove Harms for cause was granted.  (*Id*. at 845-47).

Even more significantly, Martha Dixon ("Dixon"), a Native American juror married to an African American man, had already been seated on the jury without objection.  (*Id.* at 1072).  Mr. DeSanto called Mr. Whitlock's discriminatory pattern allegation "absolutely contrary to the facts" and asserted that there was "no pattern here of trying to exclude minority jurors whatsoever."  (*Id.* at 1072-73).

In response to Mr. DeSanto's offer to provide a list of race-neutral reasons Paro-Strother was challenged, Judge Munger ruled that there was no *prima facie* showing of discrimination and a recitation of the alternate reasons for the challenge was unnecessary because he did not "see a pattern, which is what the rule requires."  (*Id.* at 1073).  He added that "[t]here probably are three or four other articulable reasons that she could be removed from the jury on a preemptory basis that have nothing to do with race."[2]  (*Id.* at 1074).  Judge Munger denied White's *Batson* challenge and excused Paro-Strother.  (*Id.* at 1073-74).

### b.  Determining White Failed to Satisfy His *Prima Facie* Burden to Prevail on His *Batson* Challenge Was Not Clearly Erroneous

A defendant's *Batson* challenge to a preemptory juror strike requires a three-step analysis.  *Rice v. Collins*, 546 U.S. 333, 338 (2006).  First, the defendant must "make a *prima facie* showing of racial discrimination."  *United States v. Campbell*, 270 F.3d 702, 705 (8th Cir. 2001) (internal citations omitted).  Specifically, the defendant must "sho[w] circumstances that give rise to a reasonable inference of racial discrimination."  *Id.* (quoting *United States v. Hill*,

---

[2]     Though Judge Munger did not articulate the reasons to which he referred, based on the record, the following facts from Paro-Strother's *voir dire* testimony undermined her impartiality: (1) Her husband's aunt was a potential witness (*Id.* at 1030-31, 1072-73); (2) DeSanto's office prosecuted her daughter several years prior (*Id.* at 1040, 1058); and (3) Judge Munger sentenced her daughter on a drug charge (*Id.* at 1058-59).  The Court also acknowledges Justice Hanson's concurrence (joined by Justices Page and Meyer) explaining that though "the [trial] court merged the three steps of *Batson*," the record supported the denial of the *Batson* challenge in light of the race neutral reasons cited above.  *White I*, 684 N.W.2d at 511.

249 F.3d 707, 714 (8th Cir. 2001)).   In other words, a defendant must demonstrate that the prosecution "exercised a preemptory challenge on the basis of race."  *Rice*, 546 U.S. at 338 (citing *Batson*, 476 U.S. at 96-97).  Second, once a showing is made, the burden shifts to the prosecution to present a race "neutral explanation" for striking the juror.  *Simmons v. Luebbers*, 299 F.3d 929, 941-42 (8th Cir. 2002) (quoting *Batson*, 476 U.S. at 97).  The prosecutor's reason need not be plausible or persuasive "so long as the reason is not inherently discriminatory."  *Rice*, 546 U.S. at 338 (citing *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)).  Third, the trial court must determine whether the defendant has satisfied his or her burden of persuasion to show "purposeful discrimination."  *Id.* (citing *Batson*, 476 U.S. at 98).

*Batson* challenges involve a "question of fact," in evaluating the credibility of whether the prosecutor's neutral reasons for striking the juror in question were "pretextual."  *Simmons*, 299 F.3d at 942.  Such factual determinations are "reviewed for clear error."  *Rice*, 546 U.S. at 338 (citing *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991)).  "In habeas proceedings in federal courts, the factual findings of state courts are presumed to be correct and may be set aside, absent procedural error, only if they are 'not fairly supported by the record.'" *Purkett*, 514 U.S. at 769 (quoting 28 U.S.C. § 2254(d)(8)).  When reviewing a *Batson* challenge, a federal court's "deference to trial court fact-finding is doubly great" given its "unique awareness of the totality of the circumstances surrounding *voir dire*."  *Weaver v. Bowersox*, 241 F.3d 1024, 1030 (8th Cir. 2001) (quoting *United States v. Moore*, 895 F.2d 484, 486 (8th Cir. 2001)).  In the Eighth Circuit, federal habeas review of a state court's *Batson* analysis is governed by §2254(d)(2) rather than § 2254(d)(1).  *Ferguson v. Carlson*, No. 08-5195 (PAM/FLN), 2009 WL 1883909, at *8 (D. Minn. Jun. 30, 2009) (citing *Weaver*, 241 F.3d at 1031 n.2).

A clearly erroneous standard applies to the trial court's decision on this issue.  *See Rice*,

546 U.S. at 338; *see also Purkett*, 514 U.S. at 769.  Engaging in the three-step *Batson* analysis codified in Minn. R. Crim. P. 26.02, subd. 6a(3), the Minnesota Supreme Court concluded, "it was not clearly erroneous for the district court to overrule an objection to a peremptory challenge when the objection was based upon an alleged 'pattern' of excluding jurors, which 'pattern' had not been established."  *White I*, 684 N.W.2d at 508 (internal citation omitted).  White's contention that the trial court applied an incorrect standard in evaluating whether he met his *prima facie* burden is unfounded.  *Batson* holds that a trial court should consider whether a "pattern" of preemptory challenges against minorities existed in evaluating "all relevant circumstances."  476 U.S. at 96-97.  Applying this aspect of a *Batson* analysis, Judge Munger denied White's challenge and cited several other reasons for striking Paro-Strother "that [had] nothing to do with race."  (Admin. R. at 1073-74).

The record supports the trial court's finding that no "pattern" existed demonstrating the removal of jurors based on race.  (*Id*. at 1067-68, 1072).  The previous day, Dixon, a Native American woman married to an African American man, was passed for cause and accepted for the jury.  (*Id*. at 859).  Furthermore, Mr. Whitlock removed prospective juror Harms for cause despite his connection to a minority because his step-daughter may have known Carlson.  (*Id*. at 1071-72).  White fell short of rebutting the trial court's presumptive correctness when it determined that the prosecutor did not violate *Batson* by preemptively striking Paro-Strother.

White's argument that the composition of his jury pool satisfied his *prima facie* burden based on a numerical analysis is without merit.  A statistical analysis of the racial composition of the jury is relevant in evaluating whether a defendant satisfied step one of *Batson*.  Yet, "the trial court's decision does not stand or fall on a numbers analysis alone."  *Weaver v. Bowersox*, 241

F.3d 1024, 1031 (8th Cir. 2001).[3]   Given White's counsel's statement that as a matter of trial strategy, he would not challenge the racial composition of the trial jury, Judge Munger's decision not to explicitly consider the racial composition of the jury was amply justified and was not clearly erroneous under the deference required in evaluating fact questions.[4]   (Admin. R. at 1068, 1073).

White's assertion that DeSanto's questioning of Paro-Strother regarding minorities in the criminal justice system created in inference of racial discrimination is similarly unavailing. Paro-Strother, not DeSanto, initially raised this topic in response to a question about her husband's employment at a juvenile detention facility.   (*Id.* at 1044-45).   Furthermore, as part of his standard set of questions Whitlock asked as least twenty-three potential jurors whether they would harbor any bias against he or White because they were African American.[5]   Mr. DeSanto, in contrast, focused on non-racially based questions.   The Minnesota Supreme Court aptly reasoned, "[m]erely because a member of a racial group has been peremptorily excluded from the jury does not necessarily establish a *prima facie* showing of discrimination; . . . [*Batson*] also requires that the circumstances of the case raise an inference that the challenge was based upon

---

[3]         It appears the Second and Third Circuit cases White cites in support of the proposition that a numbers analysis in and of itself is sufficient to meet a *prima facie* burden on a *Batson* challenge have not been adopted by the Eighth Circuit.   (Pet.'s Mem. at 9) (citing *Williams v. Beard*, 637 F.3d 195, 214 (3d Cir. 2011) and *Overton v. Newton*, 295 F.3d 270, 278 n.9 (2d Cir. 2002)); *see Ferguson*, 2009 WL 1883909, at *8 n.2 (citing *Overton* and explaining "[a]lthough other courts have found that *Batson* claims present mixed issues of fact and law, the Eighth Circuit has always viewed *Batson*-related issues as purely factual.").

[4]         The cases White cites in support of his disproportionate impact argument where all jurors of a minority group were preemptively struck are distinguishable.   (Pet.'s Mem. at 10) (citing *State v. DeVerney*, 592 N.W.2d 837, 843 (Minn. 1999) (explaining *prima facie* burden met because both Native American jurors were struck); *State v. Moore*, 438 N.W.2d 101, 107 (Minn. 1989) (only black juror in sixty-person venire panel was struck)).   Here, in contrast, Dixon, a Native American juror, was seated before Paro-Strother was struck.   This case is not analogous to either *DeVerney* or *Moore*.

[5]         (*Id.* at 28, 189, 300, 377-78, 438-39, 542, 616, 737, 752, 805, 944-45, 992, 1039-40, 1207, 1247, 1264, 1320, 1467, 1495, 1564, 1657, 1693, 1734).

race." *White I*, 684 N.W.2d at 508 (citing *State v. Taylor*, 650 N.W.2d 190, 201 (Minn. 2002)).

Given the *voir dire* testimony, it did not err in upholding Judge Munger's determination that the

record did not support an inference of racial discrimination in DeSanto's peremptory strike of

Paro-Strother. *See* 28 U.S.C. § 2254(d)(2).

### 2. Constitutionality of Accomplice Liability Statute (Ground Two)

White makes several arguments in support of his contention that the state failed to prove

that he had the requisite mental state to commit any of the three charges against him in violation

of his due process rights. First, he argues that Minn. Stat. § 609.05 ("Minnesota accomplice

liability statute") charged in conjunction with the first degree murder statute, Minn. Stat.

609.185(a)(1) and (3), created an irrebuttable presumption on an essential element of the state's

case (White's intent). He further contends that this presumption runs afoul of *Jackson v.*

*Virginia*, 443 U.S. 307 (1979) and *In Re Winship*, 397 U.S. 358 (1970) by eliminating the state's

burden to prove every element of the crime beyond a reasonable doubt. Second, he argues that

accomplice liability in first degree felony murder is unconstitutional because it eliminates the

element of intent to kill. Third, as a consequence of these purported defects, White argues that

the jury instructions, which were read verbatim from 10 Stephen E. Forestell & Wayne A.

Logan, Minn. Prac., Jury Instruction Guides—Criminal § CRIMJIG 4.01 (4th ed. 1999)

("CRIMJIG 4.01 (1999)"), violated his due process rights. Finally, he argues that the evidence

was insufficient to find him guilty of first degree murder beyond a reasonable doubt. None of

White's arguments are persuasive.

The Due Process Clause of the Fourteenth Amendment guarantees that "no person shall

be made to suffer the onus of a criminal conviction except upon sufficient proof-defined as

evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of

every element of the offense." *Jackson*, 443 U.S. at 316 (citing *Winship*, 397 U.S. at 361-64). The evidence presented at a trial is constitutionally insufficient to convict only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* at 324.  In making this determination, all trial evidence is to be viewed in the light most favorable to the state.  *Id.* at 319.  A reviewing court must presume that the trier of fact resolved all conflicting inferences in the state's favor and must defer to that resolution.  *Id.* at 326.

### a.  Relevant Facts

Relying on *State v. Souvannarath*, 545 N.W.2d 30 (Minn. 1996), *State v. Gates*, 615 N.W.2d 331 (Minn. 2000), and *State v. Hare*, 154 N.W.2d 822 (Minn. 1967), Judge Munger concluded that though the evidence on count three might not be as strong as the evidence on the other two charges, "there is sufficient factual basis for the jury to consider [the charge]." (Admin. R. at 2870-73).  Mr. Whitlock objected to the Court's ruling and, to no avail, attempted to factually distinguish the cases Judge Munger cited.  (*Id.* at 2873-78).

A portion of the jury instructions on aiding and abetting the crimes of another was inadvertently not read to the jury initially.  (*Id.* at 3136).  Upon realizing the omission, Judge Munger immediately read the omitted portion of the instruction and stated that he would be sure that the additional language was included in the instructions in the jury room and the short version of the jury instructions read after closing arguments.  (*Id.* at 3136-38).  Judge Munger read the following portions of CRIMJIG 4.01 (1999)[6]:

_____

[6]    In *State v. Earl*, 702 N.W.2d 711, 722 (Minn. 2005) the Minnesota Supreme Court held that "all future instructions on accomplice liability [should] use the entire statutory phrase 'reasonably forseeable to the person.'" (quoting CRIMJIG 4.01).  The state supreme court found that the trial court's use of the previous version of CRIMJIG 4.01 without the additional language "to the person" clarifying that the subjective rather than objective standard of intent was not reversible error.  (*Id.*).  White cannot rely on *Earl* because his appeal was final one year earlier.  *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) ("We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal,

The defendant is guilty of a crime committed by another person when the defendant has intentionally aided the other person in committing it or has intentionally advised, hired, counseled, conspired with or otherwise procured the other person to commit it.

If the defendant intentionally aided another person–and this is the part that is not in the language–if the defendant intentionally aided another person in committing a crime or intentionally advised, hired, counseled, conspired with or otherwise procured the other person to commit it, the defendant is also guilty of any other crime the other person commits while trying to commit the intended crime, if that other crime was reasonably forseeable as a probable consequence of trying to commit the intended crime . . . .

The defendant is guilty of a crime, however, only if the other person commits a crime.  The defendant is not liable criminally for aiding, advising, hiring, counseling, conspiring, or otherwise procuring the commission of a crime, unless some crime, including attempt, is actually committed.

(*Id.* at 3136-37).  With respect to accomplice Benjamin King's ("King") testimony, the Court stated, "You cannot find defendant guilty of a crime on Mr. King's testimony unless that testimony is corroborated."  (*Id.* at 3119-20).  The Court further instructed the jury that intent could be inferred from the circumstances surrounding the crime.  (*Id.* at 3124).

### b.  Constitutionality of the Minnesota Accomplice Liability Statute, Minn. Stat. § 609.05

The substantive elements of state crimes are defined by state law.  *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (citing *Jackson,* 443 U.S. at 324 n.16).  White's arguments necessitate an analysis of the relationship between the first degree murder statute, Minn. Stat. 609.185[7] and the Minnesota accomplice liability statute, Minn. Stat. § 609.05,[8] which abrogates

_____

pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.") (internal citations omitted).

[7] Minn. Stat. § 609.185 provides, in relevant part:

**609.185 Murder in the first degree**
Whoever does any of the following is guilty of murder in the first degree. . .

(1) Causes the death of a human being with premeditation and with intent to effect the death of the person or of another;
. . . .
(3) Causes the death of a human being with intent to effect the death of the person

the distinction between aiders, abettors, and principals.  *Gonzales v. Duenas-Alvarez*, 549 U.S. 127, 189-90, app. A (2007) (citing Minn. Stat. § 609.05 and verifying that every jurisdiction treats aiders and abettors the same as principals in several categories of offenses including murder).

Neither the Court nor the parties have located any United States Supreme Court precedent that finds accomplice liability in first degree murder unconstitutional.[9]  Nor has the Minnesota Supreme Court ever found that charging a defendant with first degree premeditated murder or first degree felony murder employing Minn. Stat. § 609.05 violates the U.S. Constitution, federal law, or Minnesota law.  *See State v. Earl*, 702 N.W.2d, 711, 721 (Minn. 2005) (analyzing cases finding accomplice liability statute constitutional); *see also Souvannarath*, 545 N.W.2d at 33; *State v. Pierce*, 364 N.W.2d 801, 809-10 (Minn. 1985); *State v. Gruber*, 264 N.W.2d 812, 819-20 (Minn. 1978); *see also Berrisford v. Wood*, 826 F.2d 747, 753 (8th Cir. 1987) (affirming the Minnesota Supreme Court's conclusion that a first degree murder charge on an accomplice liability theory was lawful and citing *Jackson* and *Nye & Nissen*

---

> or another, while committing or attempting to commit burglary, aggravated robbery, kidnapping . . . .

[8] Minn. Stat. § 609.05 provides, in relevant part:

> **609.05. Liability for crimes of another**
> 1. A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime.
> 2. A person liable under subdivision 1 is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by the person as a probable consequence of committing . . . the crime intended . . . .

[9]   White's reliance on *State v. Phillips*, 46 P.3d 1048 (Ariz. 2002) is misplaced.  *Phillips* is distinguishable because the defendant had no previous relationship to the victims and specific facts supporting an inference of premeditation were not present.  Moreover, *Phillips* is not mandatory authority and has never been cited by the Eighth Circuit, this Court, or the Minnesota Supreme Court.

*v. United States*, 336 U.S. 613, 619-20 (1949)).   Here, the Minnesota Supreme Court's interpretation of its state statutory and case law was consistent with *Jackson* and *Winship* when it inquired as to whether each element of a crime was proven beyond a reasonable doubt.[10]   *White I*, 684 N.W.2d at 508-09 (analyzing state's burden to prove intent and citing *Souvannarath*, 545 N.W.2d at 33, *Pierce*, 364 N.W.2d at 809-10, and *Gruber*, 264 N.W.2d at 819-20).   As such, the state supreme court's reasoning on this issue was not "contrary to" applicable United States Supreme Court law under § 2254(d)(1).

### c.   White's Jury Instruction Claim is Distinct and Procedurally Defaulted

### i.   Procedural Default

A federal district court may entertain a state prisoner's application for a writ of habeas corpus only when the petitioner exhausted the state court remedies.   28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).   The exhaustion requirement has been summarized as follows:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."   To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.

*Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal citations omitted).   To exhaust his state court remedies, a petitioner must fairly present his constitutional claims to the highest available state court before seeking relief in federal court.   *O'Sullivan*, 526 U.S. at 845.   "A petitioner meets the fair presentation requirement if the state court rules on the merits of his claims, or if he presents his claims in a manner that entitles him to a ruling on the merits."   *Gentry v. Lansdown*, 175 F.3d

---

[10]      A state court need not be aware of or cite to United States Supreme Court precedent so long as "neither the reasoning nor the result of the state-court decision contradicts them."   *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

1082, 1083 (8th Cir. 1999) (citation omitted).  Thus, a claim has not been fairly presented if a state appellate court expressly declines to address it on the merits because the petitioner violated state procedural rules.  *Hall v. Delo*, 41 F.3d 1248, 1250 (8th Cir. 1994).

When a petition contains claims that have not been fairly presented, a court must determine whether the claims are unexhausted or procedurally defaulted.  A claim is deemed unexhausted if the petitioner retains the right to seek remedies in a state proceeding.  *See* 28 U.S.C. § 2254(c); *O'Sullivan*, 526 U.S. at 845.  Generally, "[w]hen a state court remedy is available for a state prisoner's unexhausted claim, the federal habeas court must defer action until the claim is exhausted, either by dismissing the federal petition without prejudice or by using the 'stay and abeyance' procedure."  *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005), *cert. denied*, 546 U.S. 1179 (2006).  When a petitioner has not exhausted the state court remedies for a claim and state procedural rules preclude any further attempts to satisfy the exhaustion requirement as to that claim, then the claim is not truly unexhausted; rather, the claim is procedurally defaulted.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997) (citing *State v. Knaffla*, 243 N.W.2d 737, 741 (1976)).

Minnesota's *Knaffla* rule provides that all matters raised in a petitioner's direct appeal and all claims known but not asserted, are barred from consideration in a subsequent post-conviction petition.  *McCall*, 114 F.3d at 757.  If a Minnesota appellate court refuses to consider a claim on the merits because of the *Knaffla* rule, that claim is procedurally defaulted for purposes of review in federal habeas proceedings.  *Id.* at 757–58.  In *Murray v. Hvass*, the Eighth Circuit considered the *Knaffla* rule specifically and explained that "it is not the province of a federal court to decide whether a matter ought to be considered procedurally defaulted under state law."  269 F.3d 896, 899–900 (8th Cir. 2001) (citations omitted).

Only if a petitioner shows "cause and prejudice" to excuse the procedural default or, in the alternative, that there would be a "fundamental miscarriage of justice" will a procedurally defaulted claim be considered. *Coleman*, 501 U.S. at 749–50. The "cause and prejudice" exception is available only when a petitioner demonstrates that some cause, or an "external impediment," prevented him from presenting his claims to the state's highest court in a timely and procedurally proper manner, resulting in actual prejudice. *Id.* The "fundamental miscarriage of justice" exception is available only upon a "showing, based on new evidence, that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Brownlow v. Groose*, 66 F.3d 997, 999 (8th Cir. 1995), *cert. denied*, 516 U.S. 1161 (1996) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

### ii.    White's Due Process Jury Instruction Claim Is Procedurally Defaulted

In 2008, the Eighth Circuit held that White's challenge to the constitutionality of the jury instructions was not fairly presented to the Minnesota Supreme Court "by claiming generally that a defendant's due process rights are violated when a trial court fails to instruct a jury properly." *White III*, 267 Fed. App'x at 492. Furthermore, the Eighth Circuit reasoned that White's claim that Minnesota's accomplice liability statute unconstitutionally allowed the state to convict him without proving the requisite mental state was "wholly distinct" from this jury instruction or "federal fair trial" claim. *Id.* Rejecting White's "federal fair trial" claim based on a purportedly erroneous jury instruction and finding "no merit to White's argument that he has established cause and prejudice to excuse his procedurally defaulted" claim, the Eighth Circuit affirmed the District Court's judgment dismissing the claim. *Id.* at 493 (examining Order Adopting Report and Recommendation and Dismissing Without Prejudice 28 U.S.C. § 2254 Petition Dated February 2, 2007, "February 2007 Order") [Doc. No. 21].

17

The law of the case prohibits White from attempting to bootstrap the properly dismissed "federal fair trial" claim that was affirmed by the Eighth Circuit. *White III*, 267 Fed. App'x at 492; *UniGroup, Inc. v. Winokur*, 45 F.3d 1208, 1211 (8th Cir. 1995) ("The doctrine of the law of the case precludes litigation of matters decided implicitly, as well as those decided explicitly.") (internal citations omitted)). Additionally, White's arguments with respect to the jury instructions were previously considered in this Report and Recommendation as they relate to a *Jackson/Winship* analysis. Because the Court determined that White's challenge to the Minnesota accomplice liability statute is meritless, further inquiry as to any alleged exacerbating effect of the jury instructions is unnecessary.

### d. The Evidence at Trial Was Sufficient to Sustain White's Conviction

At the conclusion of the state's case, White moved for judgment of acquittal on all three counts. (Admin. R. at 2826). After hearing argument and reviewing the relevant case law, Judge Munger ruled that, viewing the evidence in a light most favorable to the state, the state had presented sufficient evidence for the jury to find White guilty of aiding and abetting attempted first degree murder (count one) and felony-murder (count two). (*Id.* at 2867). Judge Munger reasoned that issues of witness credibility were for the jury to decide. (*Id.* at 2868).[11]

For due process purposes, the relevant inquiry in reviewing the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light

---

[11]    With respect to the third count, premeditated murder, the trial court stated:

> The mens rea in this case relevant to an aider and abettor is the mens rea of the shooter, and I believe that there is sufficient basis–I'm not saying that it's an easy case for the State to make, but at least there is a case there to be made that the jury needs to consider–whether or not the death of Milton Williams was the result of a premeditated act by the shooter, Vidale Whitson. If it is, then Mr. White doesn't need mens rea. He is the aider and abettor who, according to the testimony . . . that he acquired the gun, solicited the gun, brought the group to Duluth.

(*Id.* at 2869-70).

most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman*, 132 S. Ct. at 2064 (quoting *Jackson*, 443 U.S. at 319).  In determining whether a defendant aided in a crime, his or her conduct before and after the commission of a crime is useful and highly relevant.  *See Gruber*, 264 N.W.2d at 819; 23 C.J.S. *Criminal Law* § 1327 (2012) ("[D]efendant's conduct before or after the crime was committed may give rise to an inference that the defendant participated in the crime.").

An exhaustive review of the more than 3,400 pages of trial transcript convinces the Court that there was sufficient evidence from which a rational trier of fact could have found White guilty of first degree premeditated murder, attempted first degree murder, and felony murder beyond a reasonable doubt.[12]  White and Vidale Whitson ("Whitson") brought a gun along to the planned robbery because they believed Williams would be difficult to rob.  (Admin R. at 2293-94).  Victim Carlson testified that White signaled to Whitson to begin the robbery and gave her a cold stare before Whitson shot her, corroborating King's testimony.  (*Id*. at 2699, 2706).  White was seen driving the getaway car with his accomplices after the shooting.  (*Id*. at 2215-16).  Considering the facts in the record, there is sufficient evidence under *Jackson* to support White's conviction; Ground Two should be dismissed.

### 3.  Equal Protection Clause Grand Jury Composition Claims (Ground Three)

White asserts that his Fourteenth Amendment equal protection rights were violated as a result of the racial composition of the grand jury that indicted him and the trial jury that found

---

[12]    (Admin. R. at 2215-16, 2219-20, 2283-85, 2293-96, 2298, 2300-03, 2308, 2310, 2477, 2699, 2706-09) (containing facts supporting each element of the charges against White).

him guilty on all charged counts.  White did not raise either claim on direct appeal.  Though White asserted the grand jury claim in his petition for post-conviction relief, he asserted the trial (petit) jury claim for the first time in his federal habeas petition.  (Petition, "Pet.") [Doc. No. 1 at 7].  Thus, the Minnesota Supreme Court had no opportunity to consider White's trial jury claim in its 2006 affirmance of the denial of post-conviction relief.  *White II*, 711 N.W.2d at 110-11 (holding White's grand jury equal protection claim was *Knaffla* barred).  The Court will consider these claims separately.

### a.   Grand Jury Equal Protection Claim

### i.   Relevant Facts

White was indicted by a Saint Louis County grand jury on August 17, 2001.  (Aff. of Tyrone White attached to Mem. by Tyrone White, "White Aff." Attach. D) [Doc. No. 82-3 at 22].  His counsel did not move to dismiss the indictment.  *See generally* (K8-01-60084 Docket).  Nor were any pretrial motions brought under Minn. R. Crim. P. 17.06 or 18.02.  (*Id.*).  At no point in time did White's trial counsel object to the racial composition of the grand jury or the petit jury.[13]

White filed his direct appeal, which did not contain a grand jury equal protection claim on May 12, 2003.  Before the first extension on November 4, 2003, White's brief was due on December 22, 2003.  White received a second extension to February 12, 2004 to file his *pro se* brief.  *State v. White*, No. A03-502, Order, (Minn. Jan. 12, 2004).  The Order also extended the state's response brief due date to February 23, 2004.  (*Id*).

---

[13]   In fact, Mr. Whitlock stated, "I of course told Mr. White that, because of the significant nature of the work that the county did to call this jury pool in, that I was not going to object to the pool based on a lack of representation of minorities in the pool, because I did see a couple of Native American people and the one African American person." (*Id.* at 1068).  Mr. Whitlock added that he "decided strategically" not to challenge the trial jury racial composition because of "our time frames and time lines." (*Id.*).

In preparing his direct appeal, he wrote to Saint Louis County Court Administration Chief Deputy Cindy Stratioti ("Stratioti") on January 7, 2004, requesting racial data on his grand jury and petit jury pools. (White Aff. at ¶ 4). He filed a motion to compel the court administrator to produce the grand and petit jury information on January 13, 2004. On January 30, 2004, Stratioti informed White that she could not release the information to him. (White Aff. at ¶ 4). White's motion to compel was denied on February 24, 2004.

On April 2, 2004, fifty days after White's supplemental brief was due, White received a letter from State Court Administrator Sue Dorsal ("Dorsal"), explaining that Stratioti was in error to refuse to release the jury composition information to White because the Minnesota Government Data Practices Act, Minn. Stat. §§ 13.03, 13.04, does not apply to the judiciary. (*Id.* at ¶ 4); (White Aff. Attach. C). Stratioti provided White with the grand and petit jury information he requested on April 8, 2004. White's grand jury pool had a comparable if not slightly higher proportion of non-white jurors and jurors of unknown race than the previous four grand jury pools. (White Aff. Attach. D. at 10, 21-22).[14] Despite his diligent efforts, it was too late for White to submit the jury composition information to the Minnesota Supreme Court, which issued its opinion on August 6, 2004.

### ii.    Procedural Default Analysis

The Minnesota Supreme Court determined that White's grand jury equal protection claim was *Knaffla* barred because it was not asserted on direct appeal. *White II*, 711 N.W.2d at 110-11. Reasoning that White could have asserted his claim at the time he brought his direct appeal and that grand jury challenges are untimely and improper on direct appeal, it found that no *Knaffla* exception applied. 711 N.W.2d at 110-11 (citing *State v. Whittaker*, 568 N.W.2d 440, 448

---

[14]    The 2000 demographic information Stratioti provided showed that 1.2% of Saint Louis County residents were African American and 2.2% of Duluth residents were African American. (White Aff. Attach. D at 1-2).

(Minn. 1997).   A federal court will, however, consider a procedurally defaulted claim if the petitioner can demonstrate cause and prejudice.  *Coleman*, 501 U.S. at 749–50.  The unique facts here satisfy this exception.

The nearly two-month delay due to the court administrator's mistake in not providing White with the grand jury information he requested caused White to miss his deadline for submitting his supplemental *pro se* brief on direct appeal.  This delay was not of White's making and was admittedly the court administrator's error, demonstrating good cause as to why he did not assert his claim on direct appeal.  Despite his efforts, the delay caused White's claim to be *Knaffla* barred.  Though White could have and should have requested the jury information seven months earlier when he brought his direct appeal, the court administrator's error occurred precisely within the time that White could have included his additional claim on direct appeal.  On these facts, it would be manifestly unjust to find White's claim procedurally defaulted.  *Coleman*, 501 U.S. at 749–50.

### iii.   Analysis on the Merits

Though White demonstrated sufficient cause and prejudice to overcome his procedural default, his claim is without merit.  After a petit jury's guilty verdict, probable cause objections are waived and "any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt."  *United States v. Mechanik*, 475 U.S. 66, 70 (1986); *see State v. Scruggs*, 421 N.W.2d 707, 717 (Minn. 1988).  Pursuant to the Minn. R. Crim. P., grand jury challenges must be made in the form of a motion to dismiss the indictment or they are waived.  Minn. R. Crim. P. 17.06.  *Whittaker*, 568 N.W.2d at 448.  Racial discrimination in the grand jury's composition, if proven, can justify setting aside a final judgment of conviction.  *Vasquez v. Hillery*, 474 U.S. 254, 275 (1986) (reversing conviction based on equal protection

clause violation when African American defendant was indicted by an entirely white jury when qualified African American jurors were available).

State v. Whittaker, 568 N.W.2d 440, 448 (Minn. 1997) and the Minn. R. Crim. P. are not incongruent with the Equal Protection Clause. See Vasquez, 474 U.S. at 275; Castaneda v. Partida, 430 U.S. 482, 494 (1977). Neither state court precedent nor the criminal procedural rules foreclose the assertion of racial bias in grand jury composition. Rather, they provide the timing with which such challenges should be made. White's objections to the grand jury pool are waived and there is no evidence to support White's assertion that minority jurors were intentionally excluded from the grand jury pool. (White Aff. Attach. D).

### b.   Trial Jury Equal Protection Claim

White received the trial jury composition information on April 8, 2004, together with the grand jury information. Yet, he waited to assert this claim until after his direct appeal and post-conviction relief. As such, this claim is unexhausted and cannot be considered.[15] His trial jury claim is also unexhaustable because it was not asserted on direct appeal and is Knaffla barred. In contrast, to the grand jury claim, White has demonstrated no cause for his delay in asserting his trial jury equal protection claim in his petition for post-conviction relief. Given that the cause requirement has not been satisfied, the Court need not evaluate the prejudice prong. Ashker v. Class, 152 F.3d 863, 871 (8th Cir. 1998). Ground Three should be denied in its entirety.

---

[15]    Generally, when faced with an unexhausted petition, the Court will dismiss the entirety of the Plaintiff's petition without prejudice to allow the Petitioner to exhaust his state court remedies and bring another petition for a writ of habeas corpus. Given the unique and extensive procedural history of this case, a decision on the merits of the Amended Petition's exhausted claims is appropriate. Moreover, a stay pending the outcome of any state court post-conviction review would be improper. Stay and abeyances should only be granted in "limited circumstances." Rhines v. Weber. 544 U.S. 269, 277 (2005). Even if a petitioner has good cause for his failure to first exhaust his claims in state court, "the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." Id. Here, White's unexhausted claim is meritless; a stay is not warranted.

### 4.   Intelligent Waiver of Rights Claim (Ground Four)

Ground Four of White's Petition states simply: "Petitioner didn't intelligently waive his constitutional rights . . . . [T]he question of an effective waiver of a federal constitutional right in a proceeding is of course governed by federal standards."   (Am. Pet. at 11).   In 2006, then-Magistrate Judge Nelson concluded this claim did "not create any independent basis for habeas relief, at least not where Petitioner has separately denominated for habeas relief that same equal protection claim regarding the selection of jurors."   (Report and Recommendation Dated December 19, 2006, "December 2006 R&R") [Doc. No. 19 at 10].   Judge Schiltz adopted the December 2006 R&R in its entirety including then-Magistrate Judge Nelson's findings with respect to White's intelligent waiver claim.   (February 2007 Order at 3-4).   Ground Four[16] was not revisited by the Eighth Circuit because Judge Schiltz granted a Certificate of Appealability solely on the "federal fair trial" claim.   (Order Dated April 16, 2007) [Doc. No. 30 at 7].   In 2008, the Eighth Circuit affirmed the dismissal of the mixed petition.   *White III*, 267 Fed. App'x at 493.

Ground Four of White's amended petition does not include additional facts or legal bases for his waiver claim.   Nor has his brief asserted any facts or supporting law advancing this claim aside from a general assertion that the Minnesota Supreme Court improperly found that Ground Four was *Knaffla* barred.   (Pet.'s Mem. at 24-26).   Moreover, the Amended Petition contains the same equal protection claim based on the racial composition of the grand jury that then-Magistrate Judge Nelson found to be meritless and duplicative of another ground.   In light of the previous judgment entered in this case that explicitly ruled upon Ground Four, the law of the case prevents a finding contrary to the explicit and final disposition of this issue.   *UniGroup*, 45 F.3d at 1211.   Judge Schiltz's order dismissing Ground Four should not be disturbed.

---

[16]   In his initial Petition, White's intelligent waiver claim was Ground Five.   (Pet. at 8).

### 5.  Ineffective Assistance of Counsel Claims (Ground Five)

Three of White's ineffective assistance of trial counsel claims and one of his ineffective assistance of appellate counsel claims are procedurally defaulted.  One of his ineffective assistance of appellate counsel claims is raised for the first time in his Amended Petition and will not be considered because it is unexhausted.  His remaining three claims will be considered on the merits.

### a.  Procedurally Defaulted Ineffective Assistance of Trial Counsel Claims

The Minnesota Supreme Court held that five of White's ineffective assistance of trial counsel claims, three of which are asserted in his Amended Petition, are *Knaffla* barred because they can be decided based on the trial record.  *White II*, 711 N.W.2d at 110 (citing *Carney v. State*, 692 N.W.2d 888, 891 (Minn. 2005)).  Specifically, it found *Knaffla* barred the following claims that his trial counsel was ineffective for failing to: "(1) object to or move for a mistrial based on the district court's communication with juror number four . . . [and] (3) object to uncorroborated accomplice testimony . . . ."  *Id.*  The state supreme court also held that White's claim "that trial counsel 'admitted [White's] guilt during closing argument without [White's] permission'" was *Knaffla* barred.  *Id.* (citation omitted in original).  The Minnesota Supreme Court concluded that even if it were to substantively consider these procedurally defaulted claims, White would not prevail.  *Id.* at 110-11.

A federal court cannot disturb a state supreme court's decision as to whether a habeas claim is procedurally defaulted under state law.  *Murray v. Hvass*, 269 F.3d 896, 899–900 (8th Cir. 2001) (citations omitted).  If a petitioner can demonstrate cause and prejudice, however, a federal court may review the claim on the merits.  *Coleman*, 501 U.S. at 749–50.  White contends that the cause and prejudice exception applies.  Because he was not appointed counsel

for his post-conviction proceedings, White claims that he was deprived of an "opportunity to have another attorney examine the record" and opine on the viability of his ineffective assistance of counsel claims.  (Pet.'s Mem. at 28) (quoting *Murray*, 269 F.3d at 904 (Bright, J. dissenting)).

White's post-conviction relief *pro se* status does not prevent *Knaffla* from barring these claims.[17]   A petitioner need not be represented to bring an ineffective assistance of counsel claim.  Nor does Minnesota law require a petitioner to bring an ineffective assistance of counsel claim in a collateral proceeding.[18]  As the Minnesota Supreme Court aptly reasoned, White was aware of the underlying facts giving rise to the procedurally defaulted ineffective assistance of

---

[17]     In *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000), the United States Supreme Court explained, "[t]o hold, as we do, that an ineffective assistance of counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted is not to say that that procedural default may not *itself* be excused if the prisoner can satisfy the cause and prejudice standard with respect to *that* claim." (emphasis in original).

[18]     In *Martinez v. Ryan*, 132 S.Ct. 1309, 1315 (2012), the United States Supreme Court carved out an exception to its holding in *Coleman v. Thompson*, 501 U.S. 722 (1991), which provided that attorney errors in post-conviction hearings do not qualify as cause to excuse procedural default.  *Martinez* qualified *Coleman* in finding that ineffective appellate counsel may provide cause to excuse the defendant's failure to challenge the ineffectiveness of his trial counsel, but only where state law prohibits the petitioner from raising such a claim on direct appeal.  *Id*. at 1318–19.  Although the scope of *Martinez* is not yet well defined, it has no impact on this case.

    *Martinez* addressed the right to counsel where state law dictates that the first opportunity to present an ineffective assistance of trial counsel claim is in a post-conviction, collateral state proceeding.  As the Supreme Court explained:

> The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, and petitions for discretionary review in a State's appellate courts.  It does not extend to attorney errors in any proceedings beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

*Id.* at 1320 (citations omitted).  Generally, Minnesota law requires defendants to raise a claim of ineffective assistance of trial counsel claim in direct appeal, not in a collateral proceeding.  *See Knaffla*, 243 N.W.2d at 252.  In fact, where such a claim is not raised properly in direct appeal and is alleged only later in a petition for post-conviction relief, the claim may be deemed procedurally barred.  *Id. Martinez* is inapplicable because Minnesota law permitted White to raise his ineffective assistance of trial counsel claim for the first on direct appeal.

counsel claims at the time of his direct appeal. *White II*, 711 N.W.2d at 110. These claims are resolvable on the trial record alone and White inexcusably failed to raise them on direct appeal. *See O'Sullivan*, 526 U.S. at 848 (explaining that procedural default upholds the integrity of the exhaustion requirement) (internal citation omitted). Moreover, there was no state interference with White's counsel on direct appeal, nor does White allege any facts in support of this proposition.[19] As such, White has not demonstrated cause and prejudice under *Coleman*. For completeness, however, the Court will briefly evaluate these three claims substantively.

### i.     Failure to Challenge Uncorroborated Accomplice Testimony

The record does not support White's assertion that his trial counsel failed to challenge the allegedly uncorroborated testimony of his accomplice, King. Mr. DeSanto moved for a mistrial out of fairness to the state in light of Mr. Whitlock's purportedly improper questioning and "intentional misconduct" on King's cross examination. (*Id.* at 2477, 2493-96, 2505). Mr. Whitlock "oppose[d] the motion vigorously" and contended that King was a difficult, elusive witness requiring an aggressive cross examination. (*Id.* at 2499-2500, 2502). Rather than grant a mistrial, Judge Munger ruled that a curative jury instruction would remedy Mr. DeSanto's prejudice concerns and that the jury was not tainted by Whitlock's cross examination. (*Id.* at 2508-09, 2511-13). Mr. Whitlock's lengthy and forceful cross examination demonstrates that

---

[19]     Relying on *Kimmelman v. Morrison*, 477 U.S. 365, 378 (1986) and *Murray v. Carrier*, 477 U.S. 478, 488 (1986), White also asserts that the purported ineffective assistance of his counsel on direct appeal resulting in *Knaffla* barred claims should be "imputed to the state." (Pet.'s Mem. at 25-27) (quoting *Murray*, 477 U.S. at 488). *Kimmelman* and *Murray* do not allow White to satisfy the cause and prejudice exception. In *Wooten v. Norris*, 578 F.3d 767, 779 (8th Cir. 2009), the Eighth Circuit held that in order to impute an ineffective assistance of counsel to the state as a basis for satisfying cause to excuse procedural default, the petitioner must show "something 'beyond the control of post-conviction counsel, like State interference.'" (quoting *Zeitvogel v. Delo*, 83 F.3d 276, 279 (8th Cir. 1996)).

White's contention that King's testimony was unchallenged is untrue.  Such vigorous, zealous advocacy does not constitute ineffective assistance of trial counsel.

### ii.      Failure to Object to Court's Contact with Juror

White's trial counsel's handling of the contact between Judge Munger and juror Mary Alice Kari ("Kari") was not ineffective under *Strickland*.  After *voir dire*, Kari approached Susie Freeman ("Freeman"), White's fiancée, and said something to the effect of "thank you, you helped me stay calm during this."  (*Id.* at 461-62).  Mr. Whitlock made Freeman available to Mr. DeSanto to question her regarding the incident.  (*Id.* at 462).  Freeman asserted that she did not know Kari and that Kari's comments were surprising.  (*Id.*).  Nothing about the way in which Mr. Whitlock handled the issues surrounding Kari was deficient.  (*Id.* at 462, 465).  The trial court, prosecutor, and defense counsel satisfied themselves that Kari was not in any way connected to Freeman and that she was impartial.  (*Id.* at 463-65, 467-72, 1751-54).  This ineffective assistance of trial counsel claim lacks merit.

### iii.      Purported Concession of White's Guilt in Closing Statement

Despite Mr. Whitlock's references to White's past dealings with Whitson in the context of dealing drugs and Mr. Whitlock's insertion of purportedly personal opinion into his closing arguments, he was not ineffective.  In his closing argument, Mr. Whitlock repeatedly mentioned White's drug dealing and smoking marijuana "blunts."  (*Id.* at 3242, 3250, 3257).  Referring to White and Williams in his closing, Mr. Whitlock argued, "You got two guys who's slinging a little dope, drug dealers.  It's not a popular thing to do.  It's not a good thing to do.  Judge him for that.  Don't convict him of murder because of it.  The guy was selling dope with his boy, Milton Williams."  (*Id.* at 3222-23).  To emphasize the implausibility of White intending to rob his friend, Williams, Mr. Whitlock described their relationship as follows: "This is my boy.  We

do robberies together.  Right?  We jack people together." (*Id.* at 3245).  Referencing the parties'

pretrial stipulation, Mr. Whitlock also described Whitson as sitting "on the couch, a little coked

up" prior to the murder.[20] (*Id.* at 3226).  Mr. Whitlock also stated that he personally did not care

about the facts surrounding the disposal of the gun because White "didn't have anything to do

with it" and was in the wrong place at the wrong time.  (*Id.* at 3233).  Meaning no disrespect, Mr.

Whitlock asserted, "As far as I'm concerned, Vidale Whitson could have killed Tami Carlson

with one shot." (*Id.*).

The trial record does not support White's contention that Mr. Whitlock conceded White's

guilt as to any elements of the crimes with which he was charged.  Whitlock's statements appear

to demonstrate an attempt to focus the jury on his theory of the case.  Counsel's closing

arguments are generally a matter of trial strategy, which "do not constitute ineffective assistance

of counsel unless the tactical choice is wholly without reason." *Williams-Bey v. Trickey*, 894

F.2d 314, 316 (8th Cir. 1990).  Mr. Whitlock's decision to frame the evidence and legal issues in

this manner was not objectively unreasonable.  *Stacey v. Solem*, 801 F.2d 1048, 1051 (8th Cir.

1986).

### b.  Procedurally Defaulted Ineffective Assistance of Appellate Counsel Claim

White's ineffective assistance of trial counsel claim based on the trial court's handling of

the juror Kari investigation was alleged neither in his direct appeal nor his post-conviction relief.

The state courts, therefore, did not have an opportunity to consider this claim and it is not

properly before this Court.  If White were to attempt to exhaust this claim, it would be *Knaffla*

barred because he failed to assert it on direct appeal and has not shown cause for this delay and

no other exceptions apply.  *See*, *e.g.*, *Coleman*, 501 U.S. at 750; *Brownlow*, 66 F.3d at 999.

---

[20]     In his rebuttal argument, Mr. DeSanto asserted that Mr. Whitlock's contention that
Whitson was a "fiend and a cocaine addict" was not supported by the record.  (*Id.* at 3286).

Moreover, the Minnesota Supreme Court found White's parallel ineffective assistance of trial counsel claim based on the handling of this juror contact issue was *Knaffla*-bared. *White II*, 711 N.W.2d at 110. Given that White cannot satisfy cause to excuse his procedural default, the prejudice prong of this exception need not be evaluated. *Ashker*, 152 F.3d at 871. This claim is unexhausted and cannot be considered. *See Sweet v. Delo*, 125 F.3d 1144, 1151 (8th Cir. 1997) ("A defendant, however, has no constitutional right to effective assistance of post-conviction counsel . . . . Absent a constitutional right [petitioner] cannot claim ineffective assistance of post-conviction counsel as cause for his procedural defaults") (internal citations omitted).

### c. Merits of Remaining Ineffective Assistance of Counsel Claims

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To state a claim for ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's representation was deficient and (2) the deficiency prejudiced his case. *See Miller v. Dormire*, 310 F.3d 600, 602 (8th Cir. 2002) (quoting *Strickland*, 466 U.S. at 687–88). Both prongs of the *Strickland* test must be satisfied to obtain relief; if either prong is unproven, then a reviewing court need not analyze the other prong. *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).

The first prong requires a petitioner to demonstrate that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Under this prong, the petitioner must show that counsel's representation was objectively unreasonable. *Stacey v. Solem*, 801 F.2d 1048, 1051 (8th Cir. 1986). "To establish a claim for ineffective assistance of counsel, a defendant faces a heavy burden . . . Judicial scrutiny of counsel's performance must be highly deferential." *United States v. Williams*, No. 09-3473, 2011 WL 5117914, at *2 (D. Minn. Oct. 26, 2011) (internal citations

omitted).

To satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  It is not sufficient for a defendant to show that the error had some "conceivable effect" on the result of the proceeding.  *Id.* at 693.  In the context of § 2254 ineffective assistance of counsel claims, the question is not whether a federal court believes the state court's determination under *Strickland* was correct, but whether that determination was unreasonable—a substantially higher threshold.  *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009) (internal citations omitted).

### i.      Trial Counsel's Failure to Call a Material Witness to Testify

The Minnesota Supreme Court briefly considered the merits of White's *Knaffla* barred claim that his trial counsel was ineffective for failing to call co-conspirator Charlsetta Jackson ("Jackson").  *White II*, 711 N.W.2d at 111-12.  It determined that counsel's decisions about what evidence to present constitutes trial strategy and that the decision not to call Jackson as a witness did not constitute ineffective assistance of counsel though her testimony may have contradicted state witness King's testimony.  (*Id.*).  Such decisions are subject to a highly deferential standard that requires a showing that trial counsel's strategy was objectively unreasonable.  *Williams-Bey*, 894 F.2d at 316; *Stacey*, 801 F.2d at 1051.  An unsuccessful trial strategy does not constitute ineffective assistance of counsel.  *Stacey*, 801 F.2d at 1051.

After reviewing the record, the Court concludes that Mr. Whitlock was not ineffective for opting not to call Jackson to testify.  Jackson was in the getaway car and was present in Minneapolis for the discussion regarding the procurement of the gun and robbery planning before the group left for Duluth.  (Admin. R. at 2301, 2303, 2308).  Declining to call Jackson

undoubtedly was a calculated decision because his credibility would have been at issue. Mr. Whitlock acknowledged the implications of this decision prior to closing arguments.[21] He may not have wanted to risk Mr. DeSanto's cross examination and, for strategic reasons, could have reasonably decided not to open that door. Mr. Whitlock's failure to call Jackson as a witness does not satisfy the first prong of *Strickland*.

White also requests an evidentiary hearing to determine what Jackson's hypothetical testimony would have been. An evidentiary hearing in a habeas corpus proceeding is appropriate only where the petition alleges sufficient grounds for release, the facts are in dispute, or the state courts did not hold a full and fair evidentiary hearing. *Wilson v. Kemna*, 12 F.3d 145, 146 (8th Cir. 1994) (citations omitted). A petitioner is not entitled to a hearing when the record establishes his claims are barred from habeas review or are without merit. *Id.* (citations omitted). The record before the Court conclusively demonstrates that White's ineffective assistance of counsel claim on this ground is baseless. Furthermore, relying solely on his financial inability to hire a private investigator, White has not alleged any specific additional facts that would justify relief even if resolved in his favor.[22] Accordingly, his request for an evidentiary hearing should be denied.

---

[21]    Before closing arguments, Mr. DeSanto made a motion *in limine* to exclude any references to the fact that accomplices Vidale Whitson, Charlsetta Jackson, and Noel Johnson did not testify. (*Id.* at 3099). In making the motion, he cited *State v. Thomas*, 232 N.W.2d 766 (Minn. 1975); *State v. Yaedke*, 242 N.W.2d 601 (Minn. 1976); and *State v. Swain*, 296 N.W.2d 707 (Minn. 1978) in support of the proposition that a defense attorney commenting on the fact that a particular witness was not called gives the defendant an unfair advantage. (Admin. R. at 3100). Mr. Whitlock agreed with Mr. DeSanto's characterization of the issue and stated, "It is the law. . . . I do know the rule. Neither side can, nor will I, talk about the fact that Charlsetta Jackson is not here." (Admin. R. at 3100-02). Judge Munger granted Mr. DeSanto's motion. (*Id.* at 3102).

[22]    Though White included Jackson's material witness statement in support of his memorandum, he did not cite any specific disputed facts.

### ii.   Appellate Counsel's Failure to Challenge Uncorroborated Accomplice Testimony on Direct Appeal

The Minnesota Supreme Court dismissed White's claim that his appellate counsel was ineffective for failing to challenge the jury instructions for an alleged absence of an instruction on the corroboration requirement for accomplice liability.  (Pet.'s Mem. at 21-22) (citing Minn. Stat. § 634.04).  The state court reasoned it was merely a restyling of his jury instruction claim. *White II*, 711 N.W.2d at 113.  White contends that the state supreme court failed to seriously consider his claim and that this errant instruction is relevant to the *Jackson/Winship* analysis on Ground Two of his Amended Petition.  (Pet.'s Mem. at 22).

White's arguments fail for several reasons.  First, the record demonstrates that the trial court did in fact remind the jury that they could believe accomplice King's testimony only if it was corroborated.  (Admin. R. at 3119-20).  Second, on direct appeal White's counsel challenged the accomplice liability jury instruction and sufficiency of the evidence.  (*White I*, 684 N.W.2d at 502).  Third, the Court has already determined that White's trial counsel was not ineffective in his handling of this issue given his aggressive cross examination challenging King's credibility. White's appellate counsel's reasonable and competent representation was not ineffective under *Strickland*.

### iii.   Trial Counsel's Failure to Investigate and Question an Allegedly Impartial Juror

White claims that trial counsel was ineffective for failing to uncover that jury foreperson Dixon worked with Theresa Lynn Hindsley ("Hindsley"), victim Tami Carlson's roommate, at the Fond-Du-Luth Casino in Duluth, Minnesota.  He also alleges that Mr. Whitlock was ineffective for failing to move for a *Schwartz* hearing.

When Dixon testified that she worked at the Fond-Du-Luth Casino on *voir dire*, the connection between she and Hindsley could have been discovered. Contrary to the Minnesota Supreme Court's assertion that the trial record did not contain a "statement or report" substantiating the connection between Dixon and Hindsley, the relevant pretrial disclosures, witness lists, *voir dire* testimony, and trial testimony referencing Hindsley, have been part of the record since trial. *White II*, 711 N.W.2d at 112. The state bears the burden to develop an adequate record for habeas review. *See* Rule 5 Governing Section 2254 Cases in the United States District Courts. Given the gravity of this case and its tortured history, the absence of critical documents in the initial Administrative Record is troubling. In his petition for post-conviction relief, White specifically mentioned the key police report contained in the pretrial disclosures and provided its date and contents. (Pet. for Post-Conviction Relief Dated April 7, 2005 at 7-9, contained in App. to Resp't's Mem. in Supp. of Mot. to Dismiss Pet. for Writ of Habeas Corpus) [Doc. No. 6] (maintained on file with the Clerk of Court)). Though this Court shares the Minnesota Supreme Court's concern regarding the veracity of Dixon's *voir dire* testimony, the record does not support granting habeas relief based on its factual determinations or ineffective assistance of counsel holding. *White II*, 711 N.W.2d at 112.

## 1. Dixon's *Voir Dire* Testimony

Dixon, a Native American woman and the jury foreperson, worked as a black jack dealer supervisor at the Fond-du-Luth Casino. (Admin. R. at 857-59). In response to a question about the employees she supervised, Dixon responded, "[E]verybody's been there in that department for a number of years, so we're kind of all real close, you know, know each other pretty well and each other's habits and stuff." (*Id.* at 859).

When asked if she harbored any prejudice against African Americans, Dixon stated that

her husband was African American.  (*Id.* at 865).  Dixon was questioned at length about her prior

connection with Mr. DeSanto because he prosecuted her brother's murderers in 1997.  (*Id.* at

847-52).  The defendants charged in her brother's murder all pled guilty.  (*Id.* at 855).  In her

brother's case, Dixon did not have any personal interaction with Mr. DeSanto; Dixon simply

"watched him do his job."  (*Id.* at 856, 877).  She asserted, "I don't think we've even ever talked,

really, so it's not going to affect me."  (*Id.* at 856).

Several times, Dixon stated she did not think her frustration with the plea bargain process

and the way her brother's case was handled would affect her ability to be open-minded and fair.

(*Id.* at 855-56, 888).  Nor did Dixon harbor any personal frustration with Mr. DeSanto.  (*Id.* at

856, 888).  Mr. DeSanto also asked her whether she could be impartial despite the "horrific

circumstances" endured in losing her brother.  (*Id.* at 852).  Dixon responded, "I would say that I

would hope I could do that."  (*Id.*).

Dixon stated nearly a dozen times that she believed she could be fair and impartial.[23]

Relying on Dixon's assertion that she did not know any of the parties or witnesses, neither party

asked her about any potential connection with Hindsley, who was disclosed as a possible

witness.  After questioning Dixon at length regarding her background and impartiality, Mr.

Whitlock passed Dixon for cause and accepted her for the jury.  (*Id.* at 876-77).  At the

conclusion of his questioning, Mr. DeSanto asked Dixon whether there were any questions that

he may have failed to ask that would affect her ability to serve as an impartial and fair juror.  (*Id.*

at 900).  She responded, "I don't think so."  (*Id.*).  Mr. DeSanto then accepted Dixon as a juror.

(*Id.* at 899-901).

Next, Judge Munger asked Mr. Whitlock if he planned to challenge Dixon's selection for

cause.  (*Id.* at 900-01).  Mr. Whitlock did not challenge Dixon for cause and Judge Munger

---

[23]      (*Id.* at 859, 862-63, 864, 865, 871, 872, 876, 888, 895, 897, 898, 899, 1072).

instructed Dixon to be seated as a juror.[24]   (*Id.* at 901-02).   Ultimately, as foreperson, Dixon

signed the verdict form finding White guilty on all three counts.   (*Id.* at 3306-07).

### 2.   Witness Testimony and Documents Referencing Hindsley

Hindsley, also known as "Ciga," was Carlson's roommate at the time of the murder.   (*Id.*

at 2742, 2744).   Hindsley was an acquaintance of White, Williams, and Christina Anderson

("Anderson").   (*Id.* at 2885).   The first page of the witness list dated December 27, 2002 and

every version of the list provided to the Court,[25] contained the name "Hindsley, Theresa Lynn."

(Coates Aff. at Ex. G); *see*, *e.g.*, *State v. White*, Dist. Ct. File 68 K8-01-600840 vol. 1 at 8, vol. 3

at 112, 125, Ex. A attached to Coates Aff., hereinafter, "Disclosures CD" (maintained on file

with the Clerk of Court).   Dixon testified that she did not know anyone on the witness list or any

of the jury panel members.   (Admin. R. at 863, 875, 878).   The parties are uncertain about the

version of the witness list the jury saw.   Given that the record does not appear to contain any

versions of the witness list without Hindsley's name, it is likely that Hindsley's name was on the

list shown to Dixon.

A police report dated April 25, 2001 completed by Duluth Police Officer Joel Don

Olejnicak ("Officer Olejnicak") was contained in the state's first set of pretrial disclosures.

(Coates Aff. at Ex. C at 2); (Disclosures CD, vol. 2 at 63-68, vol. 10 at 209-11).   On the third

page of the police report, Officer Olejnicak wrote:

> I also spoke with THERESA LYNN HINDSLEY, DOB/03-1-80.   HINDSLEY
> said she is a roommate of CARLSON and had been living there for approximately
> two weeks.   HINDSLEY said that she works at the Fond-Du-Luth Casino and had
> left for work at approximately 1530 hours and had not been at the residence since
> then.   HINDSLEY said when she left the residence, CARLSON was the only

---

[24]    The state exercised eight preemptive juror challenges.   (*Id.* at 327, 551, 791, 969, 1065, 1227, 1301, 1673).   White exercised ten.   (*Id.* at 588, 740, 821, 831, 1114, 1251, 1470, 1574, 1605, 1640).   White requested the removal of one juror for cause, whereas the state made two such requests.   (*Id.* at 931-23, 1301, 1380-81).

[25]    The trial record contained several versions of the witness list.

person there.

(*Id.*); (White Decl. Ex. A) [Doc. No. 77 at 3].   At trial, Mr. Whitlock and Mr. DeSanto

apparently referred to this report in examining Officer Olejnicak.  (Admin. R. at 1898, 1916).

The report, however, was not identified in a trial exhibit list and the Court is unsure as to whether

the report was marked for identification at trial.[26]   (Coates Aff. at Ex. E).  Though the pretrial

disclosures and witness lists were not part of the administrative record initially provided to this

Court, these materials appear to have been a part of the case record transferred to the Minnesota

Supreme Court in 2003 and 2005.  (Disclosures CD, vol. 3 at 47-48, vol. 5 at 122, vol. 11 at 153-

54, 167).

Though Hindsley did not testify, she was mentioned in the context of accompanying

Carlson, Williams, White, and Anderson to the Twin Cities several days prior to the murder.

(Admin. R. at 2742, 2748, 2884-85, 2901).  One of the considerations in the timing of the return

trip to Duluth was Hindsley's need to be at work the following day.[27]  (*Id.* at 2887).   According

to the state's theory, White's disagreement with Williams over payment for a hotel room where

Hindsley, White, and Williams stayed that night in the Twin Cities partially provided a motive

for the robbery.  (*Id.* at 2744-45, 2886-87, 2903-04).  Hindsley was referenced in Anderson's and

Carlson's testimony repeatedly.   (*Id.* at 2748, 2887-88, 2905-06).   Nearly two years after the

trial, White's family hired a private investigator, Bill Ojile, who confirmed that Dixon and

Hindsley were both employed at the Fond-du-Luth Casino until April 2001 when Hindsley's

---

[26]      The facts are also unclear as to whether this police report was part of the appellate record
before the Minnesota Supreme Court when it addressed this issue.  White insinuates that the
Minnesota Supreme Court overlooked critical evidence when it simply "couldn't find" this
report.  (Pet.'s Mem. at 33).
[27]      The testimony did not state Hindsley's place of employment.  (*Id.* at 2887).

employment ended.[28]   (White Aff. Attach. A) [Doc. No. 82-1 at 1].

### 3.  Section 2254(d)(2) Analysis

Notwithstanding the Minnesota Supreme Court's assertion to the contrary, the record

does in fact contain documents, independent of White's post-conviction private investigator's

letter, that connect Dixon and Hindsley.  *White II*, 711 N.W.2d at 112.  Thus, the Minnesota

Supreme Court may not have considered all facts relevant to White's claim.[29]  *Id*.  The

Minnesota Supreme Court's opinion states in relevant part:

> Voir dire of the foreperson also addressed her place of employment,
> whether she knew any of the people on a list provided to her (presumably
> potential witnesses), and whether she had any previous knowledge "about this
> case."  There was no specific discussion during voir dire of any working
> relationship between the foreperson and the victim's roommate, but the
> foreperson apparently indicated that she did not know anyone on the list. The
> victim's roommate's name was on the witness list filed with the court on
> December 27, 2002, but it is unclear if this same list was shown to the foreperson
> on January 9, 2003.  White acknowledges that the victim's roommate was not a
> witness to the shootings, that investigators concluded that she "was not involved
> in the incident," and that she was not called to testify at trial.
>
> White asserts that the victim's roommate was a blackjack dealer at a
> casino where the foreperson was employed as a supervisor.  White bases this
> claim on a statement allegedly made by the victim's roommate to an investigator
> with the Duluth Police Department, in which the victim's roommate said she was
> at work at the casino at the time of the shooting. We can find no statement or
> report mentioning such a statement in the district court record, and White did not
> attach any such statement or report to his petition. **If the victim's roommate was
> in fact employed at the casino and the foreperson knew her, it is possible that
> the foreperson had previous knowledge about the case that prevented her
> from being impartial**.  Nevertheless, because White failed to provide evidence to
> support his claim that the foreperson was unable to be impartial, we cannot
> conclude that White's trial counsel was ineffective for failing to request a

---

[28]   Though Ojile ascertained that Dixon worked at the casino since July 1996, his letter did not specify when Hindsley's employment began.  (White Aff. Attach. A).

[29]   In support of the proposition that Mr. Whitlock should have discovered the connection between Hindsley and Dixon, White emphasizes that after the murder, Anderson talked with White's investigator, Kyphus Turner, and that an April 25, 2001 police report mentioned that Hindsley worked at the Fond-du-Luth Casino.  (*Id.* at 2892); (Pet.'s Mem. at 33); (White Decl. Ex. A) [Doc. No. 77 at 3].

*Schwartz* hearing.

*Id.* (emphasis added).

Relying on *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), White contends that he is entitled to habeas relief because of the Minnesota Supreme Court's alleged error in overlooking Officer Olejinack's report and the private investigator's letter. (Pet.'s Mem. at 34). Because White asserts that the Minnesota Supreme Court made factual errors, this claim within Ground Five is evaluated under both 28 U.S.C. § 2254(d)(2) and § 2254(d)(1). *See Lee*, 222 F.3d at 442. In order for a state court's factual error to give rise to habeas relief a petitioner must "presen[t] clear and convincing evidence to refute the state court's presumptively correct factual findings." *See Whitehead v. Dormie*, 340 F.3d 532, 539 (8th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). A petitioner must also "demonstrat[e] that the state court's determination of facts was unreasonable." *Id.* (citing 28 U.S.C. 2254(d)(2)). *See Boyd v. Minnesota*, 274 F.3d 497, 501 n.4 (8th Cir. 2001); *Ferguson*, 2009 WL 1883909, at *7-*8.

While the Minnesota Supreme Court may not have adequately considered all relevant portions of the trial record, White failed to show by clear and convincing evidence that the state court's factual findings on the connection between Hindsley and Dixon "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). The Minnesota Supreme Court specifically examined Dixon's *voir dire* testimony and emphasized Dixon's repeated assertions that she did not know anyone on the witness list. *White II*, 711 N.W.2d at 112. It also noted that Hindsley's name was on the December 27, 2002 version of the witness list. *Id.* Additionally, the state court referenced Hindsley's statement to "an investigator with the Duluth Police Department" that she was at work at the Fond-du-Luth Casino at the time of the murder. *Id.* White has not shown that the state court's finding that "no

report or statement relevant to this claim" was unreasonable given neither Officer Olejnicak's report nor the private investigator's letter demonstrates that Dixon and Hindsley actually worked together directly or were acquainted in any way.  28 U.S.C. § 2254(d)(2) or § 2254(e)(1).  At best, these documents make White's claims of juror bias plausible.

### 4.  Section 2254(d)(1) Analysis

A defendant has a constitutional right to an impartial jury.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Under the first prong of *Strickland*, the Court must determine whether Mr. Whitlock's performance fell below objectively reasonable professional standards.  466 U.S. at 687.  In *Williams v. Taylor*, 529 U.S. 420, 441-43 (2000), after trial, it was uncovered by an investigator searching public records that a juror failed to disclose that she was the ex-wife of a sheriff's deputy who testified at trial.  Holding that these facts standing alone were insufficient to prove actual bias, the Supreme Court reasoned, "We would be surprised, to say the least, if a district familiar with the standards of trial practice were to hold that in all cases diligent counsel must check public records containing personal information pertaining to each and every juror." *Id*. at 443.  The Court further asserted that because the juror was silent at trial on her connection to her ex-husband sheriff witness, counsel had "no basis for an investigation into [her] marriage history." *Id*.[30]

Based on the facts available to him, Mr. Whitlock should have further investigated Dixon's background on *voir dire*.  Specifically, he should have discovered the link between Dixon and Hindsley and requested a *Schwartz* hearing to investigate whether Dixon was truthful when she stated she did not know anyone on the witness list.  Nevertheless, his failure does not rise to the level of ineffective assistance of counsel.  To expect trial counsel to conduct an

---

[30]     Rather than affirm the Court of Appeals's determination that the record supported a finding of actual bias, the Supreme Court remanded the case for an evidentiary hearing.  *Id*. at 444.

investigation as to the impartiality of every juror, even those who repeatedly and unequivocally state their impartiality on *voir dire*[31] misconstrues *Strickland*. Moreover, Hindsley did not testify, nor were she and Dixon familially related. Stated another way, the connection between Dixon and Hindsley was more tenuous than the relationship between the *Williams* juror and her ex-husband. Though Mr. Whitlock's representation can be criticized in hindsight, his failure to request a *Schwartz* hearing or further investigate the connection between Dixon and Hindsley did not render him ineffective under *Strickland*.

The Court finds that the first prong of *Strickland* was not met. Nonetheless, for completeness, the prejudice prong will be considered. *Cf. Apfel*, 97 F.3d at 1076. In order to demonstrate prejudice sufficient to give rise to habeas relief, White must show that but for Mr. Whitlock's purported errors, the result of his trial would have been different. *Strickland*, 466 U.S. at 694. In *Krutilek v. Kenney*, 125 Fed. Appx. 93, 94 (8th Cir. 2005) counsel was not ineffective for not striking five allegedly impartial jurors despite their answers in *voir dire* insinuating they were biased against the defendants because they themselves had been crime victims. *Id*. Additionally, one of the five jurors notified the court during trial that he realized that he was acquainted with a witness's daughter. *Id*. Petitioner's counsel "admitted at the evidentiary hearing that [petitioner's] trial was her first and having no *voir dire* strategy, she did not attempt to follow up the jurors' equivocal answers with more questioning." *Id*. at 95. Yet, the Eighth Circuit held that the prejudice prong of *Strickland* was not met because the petitioner did not show actual bias. *Id*. Similarly, in *Williams v. Norris*, 612 F.3d 941, 954-55 (8th Cir. 2010), the Eighth Circuit determined that counsel was not ineffective for failing to remove a juror for cause who stated a proclivity towards the death penalty.

Jury impartiality is of critical importance to the integrity of the judicial system. The facts

---

[31]     *See supra* note 23 (listing instances where Dixon asserted her impartiality).

of this case, however, are not the stuff of a cognizable claim for ineffective assistance of counsel based on failure to investigate juror bias. The information available at trial connecting Dixon and Hindsley was nowhere near as apparent as was the stated juror bias ascertainable at trial in *Krutilek* or *Williams*. The only direct link between Hindsley and Dixon was that they both worked at the Fond-du-Luth Casino. White's assertion of bias is little more than an inference based on Dixon's statement in *voir dire* that she had a close relationship with the employees she supervised. (Admin. R. at 859). No record evidence shows that Hindsley and Dixon directly worked together or even knew of each other.

Even if this juror bias claim were brought against the trial under the Due Process Clause, it would fail.[32] To succeed on a juror bias claim, a petitioner "must show that the juror was actually biased against him." *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir. 1995). Juror bias "is a question of fact, and we defer to a state court finding of juror bias if it is fairly supported by the record." *Antwine v. Delo*, 54 F.3d 1357, 1369 (8th Cir. 1995). To demonstrate actual bias, a petitioner must show "an impermissible affirmative statement." *Williams v. Norris*, 612 F.3d 941, 954-55 (8th Cir. 2010). A juror's "equivocal" statement in *voir dire* that "did not affirmatively state bias" is insufficient to give rise to habeas relief. *Mack v. Caspari*, 92 F.3d 637, 642 (8th Cir. 1996). A peripheral relationship generally is insufficient to create a basis for habeas relief unless a petitioner can show actual bias. *See United States v. Tucker*, 243 F.3d 499, 509 (8th Cir. 2001) (explaining bias is only presumed where juror is a close relative of a victim or party). In *Mack v. Caspari*, 92 F.3d 637, 641-42 (8th Cir. 1996), no juror bias existed when a

---

[32]     Because White's claim was presented to the Minnesota Supreme Court and this Court as an ineffective assistance of counsel claim, it must be analyzed under *Strickland*. If White had alleged that his due process rights were violated by the trial court's failure to excuse Dixon for cause or other grounds for juror bias independent of his counsel's conduct, the analysis would be different. Under the AEDPA, however, only those claims that are fairly presented to the state courts are reviewable here. *See Clark v. Caspari*, 274 F.3d 507, 509-10 (8th Cir. 2001) (citing *Hall*, 41 F.3d at 1249).

juror's sister-in-law's mother was shot and raped and her *voir dire* statements were sufficient to demonstrate that "her attitude towards those accused of crimes has not been affected by knowing the victim of a crime, and . . . while equivocal, did not affirmatively state bias." *Id*. at 642. Similarly, in *Fuller v. Bowersox*, 202 F.3d 1053, 1058 (8th Cir. 2000), the Eighth Circuit found a juror's former employment with law enforcement "simply too speculative to allow, as a matter of law, a presumption of bias on the part of the juror in question." (internal citation omitted)).

Here, Dixon and Hindsley were, at most, co-workers. They had no familial relationship or any other connection creating a presumption of bias. *See Fuller*, 202 F.3d at 1058. Dixon's repeated declarations of impartiality despite her past connection with Mr. DeSanto demonstrate an absence of bias. *See Mack*, 92 F.3d at 641-62. Hindsley did not actually testify at trial and was tangentially mentioned less than ten times. (Admin. R. at 2742, 2744-45, 2748, 2884-87, 2901, 2903-06). The record does not support a finding of juror bias.

### 5. White's Request for an Evidentiary Hearing Should be Denied

White requests an evidentiary hearing "to further examine this claim and to determine whether trial counsel was aware of this evidence, and to determine why a *Schwartz* hearing was not demanded or held in state court." (Pet.'s Mem. at 33-34). In order to obtain an evidentiary hearing, a petitioner must satisfy 28 U.S.C. 2254(e)(2), which contains "mandatory restrictions" including the requirement that a petitioner show he or she "was unable to develop his claim in state court despite diligent effort." *Williams v. Norris*, 576 F.3d 850, 860 (8th Cir. 2009); *see* Rule 8(a) Governing Section 2254 Cases in the United States District Courts. "Even if an evidentiary hearing is not barred by § 2254(e), that does not mean that the petitioner is entitled to a hearing." *Shepersky v. Wengler*, No. 09-2049 (PJS/SRN), 2011 WL 1189099, at * 1 (D. Minn. Mar. 28, 2011).

Though this is a close issue, the Court finds that White is not entitled to an evidentiary hearing. *See* 28 U.S.C. § 2254(e). He has not shown adequately an inability to develop the record on post-conviction relief. White's claim does not rise to a level sufficient to justify granting a habeas petition. The Minnesota Supreme Court, however, could re-open this case for the limited purpose of holding a *Schwartz* hearing to question Dixon. This would allow it to reconsider White's ineffective assistance of counsel claim in light of the evidence it may have overlooked on White's Petition for Post-conviction Relief.

### C.  Certificate of Appealability

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his Petition unless he is granted a Certificate of Appealability ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA cannot be granted, unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). To make such a showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. Daniel*, 529 U.S. 473, 484 (2000).

In this case, the Court finds it unlikely that any other court, including the Eighth Circuit Court of Appeals, would decide Petitioner's claims any differently than they have been decided here on Grounds One, Two, Three, Four, and claims one, three, four, and five of Ground Five. With respect to these claims, White has not identified–and the Court cannot independently discern–anything novel, noteworthy or worrisome about this case that warrants appellate review. White should receive a COA on claim two of Ground Five because this ineffective assistance of counsel claim based on juror bias may be debatable among reasonable jurists.

## II.      RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED that**:

1. White's amended Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody [Doc. No. 61] be **DISMISSED WITH PREJUDICE**;

2. White's request for an evidentiary hearing be **DENIED**;

3. White should **NOT** be granted a Certificate of Appealablity on Grounds One, Two, Three, Four, and claims one, three, four, and five of Ground Five; and

4. White **SHOULD** be granted a Certificate of Appealablity on claim two of Ground Five.

Dated: August 7, 2012

s/ Steven E. Rau_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 21, 2012,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.